Filed 6/3/24  P. v. McFadden CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096562 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE012919) |
| v. | |
| LAYMAN COULTRY MCFADDEN, | |
| Defendant and Appellant. | |

Defendant Layman Coultry McFadden sexually assaulted and abused three women at a homeless encampment.  After a jury trial, the jury found defendant guilty of one count of rape, three counts of forcible oral copulation, two counts of domestic violence, two counts of felony false imprisonment, three counts of aggravated assault, and one count of criminal threats.  The jury also found true a multiple-victim sentencing allegation pursuant to Penal Code section 667.61.[1]  The trial court sentenced defendant to

---

[1]    Unspecified section references are to the Penal Code.

an aggregate indeterminate term of 60 years to life, plus a consecutive determinate term of five years and eight months.

On appeal, defendant raises numerous contentions, including claims of insufficiency of the evidence, as well as purported evidentiary, instructional, and constitutional errors. We will reverse the conviction on one count of aggravated assault, modify the judgment to correct minor sentencing errors, and otherwise affirm the modified judgment.

BACKGROUND FACTS AND PROCEDURE

On April 14, 2022, a consolidated 12-count information was filed charging defendant with crimes against three different unhoused women: Kimberly Doe, Eleanor Doe, and Carli Doe. As to Kimberly, the information charged defendant with rape (§ 261, subd. (a)(2); count one), two counts of oral copulation (§ 287, subd. (c)(2)(A); counts two & three), felony false imprisonment (§ 236; count four), and aggravated assault (§ 245, subd. (a)(4); count five), all occurring on September 4, 2019, as well as an additional count of aggravated assault (§ 245, subd. (a)(4); count six) on March 4, 2020.

As to Eleanor, the information charged defendant with domestic violence (§ 273.5, subd. (a); count seven) and aggravated assault (§ 245, subd. (a)(4); count eight) on June 17, 2021, and criminal threats (§ 422; count nine) on June 18, 2021.

As to Carli, the information charged defendant with oral copulation (§ 287, subd. (c)(2)(A); count ten), domestic violence (§ 273.5, subd. (a); count eleven), and felony false imprisonment (§ 236; count twelve), occurring sometime between July 16 and July 31, 2021.

Counts one, two, three, and ten included a multiple-victim allegation under the One Strike law (§ 667.61, subds. (b), (c)).

A.     *Kimberly Doe: Counts One through Six*

In 2019, both Kimberly and defendant were unhoused and living in tents along the American River near Sacramento. Kimberly described defendant as an acquaintance who

2

had always been nice to her, but she denied there was any romantic relationship between them.[2]

Although defendant had never shown any signs of violence towards Kimberly, that changed shortly after Kimberly moved her tent and began living near defendant. Defendant began to get angry and controlling with her and would yell at her if she did something he thought was wrong.

In the early morning hours of September 4, 2019, Kimberly was in defendant's tent, kneeling over her purse, trying to find change for a vending machine. Defendant entered the tent acting "strange" and told Kimberly to take off her clothes. Kimberly thought defendant was kidding and said, "No. Are you crazy? I'm not going to do that." Defendant persisted, repeatedly demanding that she remove her clothes, with increasing aggressiveness. When Kimberly refused, defendant exclaimed, "Bitch I told you to take your fucking clothes off." Defendant then grabbed Kimberly's sweatshirt from behind, yanked her backward, and put his arm around her neck, squeezing so tightly that she could not breathe. He then smacked her in the face with several "karate chop[s]," pushed her head down, and forced her to orally copulate him until he ejaculated. Defendant then blocked the door to the tent and told Kimberly that she "wasn't going anywhere." Defendant made threatening physical gestures and gave menacing looks. Defendant also showed her a gun.

Sometime later—Kimberly was unsure of the timing—defendant assaulted her again. Defendant pulled down her pants and had vaginal intercourse with her from behind until he ejaculated. Kimberly did not consent to the intercourse, but she also did not resist because she did not want to provoke defendant for fear of getting hurt.

---

[2] While Kimberly disclaimed a romantic relationship with defendant, Eleanor testified that Kimberly had claimed to be defendant's "girlfriend." Carli testified that Kimberly and defendant had "dat[ed]."

Later still—Kimberly was again unsure of the timing—defendant pulled out his penis, grabbed Kimberly by the hair, and forced her to orally copulate him. Before defendant ejaculated, Kimberly managed to slip free and escape from the tent. She ran to a nearby casino and reported the incident to an employee, who called the police. When the police arrived, Kimberly gave them her account of what happened, which was generally consistent with her trial testimony.[3] Her recorded statements were played for the jury.

Law enforcement located defendant on a dirt path near the casino. He was carrying a BB gun in his waistband. Kimberly was taken to defendant for an in-field show-up and she identified him as her attacker.

After the in-field show-up, Kimberly was transported to the hospital for a sexual assault examination. She was "tearful, crying, trembling and shaking," but cooperative and coherent. There were bruises on both her knees and on her right breast. There was redness and swelling to her labia, redness on her bottom, and her vagina was tender to the touch. There were no identifiable injuries to her head, face, or neck. DNA testing revealed defendant's reference profile matched the sperm sample taken from Kimberly's vagina. The physical findings were consistent with Kimberly being sexually assaulted, but also with consensual sex.

Kimberly occasionally saw defendant after he was released from jail. Defendant would stare at her or make a "taunting" noise. Then, on March 4, 2020, at about 2:00 a.m., defendant came to Kimberly's tent, cut it open with a knife, and punched her in the face five to six times. She did not report the assault to law enforcement, but she did take

---

[3]     The biggest discrepancy related to how the second assault began. During her police interview, Kimberly said that "[n]ot . . . long" after the initial oral copulation, defendant "flipped [her] around" before he pulled down her pants and had intercourse with her. At trial, Kimberly was uncertain about the timeframe between the assaults, and she testified that she already was laying down, facing the back of the tent, because "he was like wanting [her] to go to sleep."

4

photographs of her face, which were shown to the jury. She had a black eye, a fat lip, and a fractured nose. After the March 4 beating, Kimberly abandoned her belongings and left the campsite.

B. *Eleanor Doe: Counts Seven through Nine*

Eleanor was a 51-year-old unhoused woman living in a tent near the American River. In June 2021, she and defendant were seeing each other romantically and staying in each other's tents.

On the morning of June 17, 2021, a woman named Asia, who Eleanor considered a daughter, told Eleanor that defendant either raped or had sex with her. Eleanor then approached defendant and confronted him. Defendant became "devilish" and said, "What the fuck you asking me? What the fuck I look like? . . . Get up out of here." She tried to leave but slipped and fell to her knees. She told defendant that she could not get up and asked for help, but defendant refused and kept telling her to "[g]et the fuck out of here." He told Eleanor that he "should kick [her] in [her] face," and kicked rocks and dirt into her face. Defendant grabbed a sword or machete-type knife and held it threateningly. He then threw it down, picked up the fork from a bicycle, and appeared as though he was going to hit her with it. Then he choked her for so long that she could not breathe, became dizzy and weak, and almost lost consciousness. Eventually, he stopped choking her and told a passerby to "come get this bitch up out of here."

Eleanor called 911 and reported that she had fallen, but hung up when defendant told her to get off the phone. The 911 operator called back, but Eleanor quickly hung up again because defendant "[did] not want [her] talking on the phone." The 911 operator called back again, and Eleanor said that she was "on the ground" and someone was "kickin' dirt in [her] face" and "about to hit [her]." She told the operator, "This person choked me, until I couldn't breathe." She also said that he had a gun and that he had threatened to shoot her. She did not know the man's real name, but she was able to describe him and said he was called "Frisco."

5

Eleanor also told the 911 operator that she did not want to speak to the police because she feared for her life. However, her demeanor sometime suggested that she was not afraid. On the 911 calls, she can be heard saying to defendant, "You're going to kill me? I'm a woman though. That's a coward. Pull me up, Pull me up here. Please." She also said, "Yeah you goin['] to jail." In addition, as he was leaving, she taunted, "[T]hat's the coward in you. You ain't no man, [N-word]," and "You better not come back here."

Law enforcement arrived and Eleanor told them what happened. Photographs taken by law enforcement showed injuries to her eyes and neck, including redness, bruising, and handprint marks, consistent with choking or strangulation.

After the police left, defendant asked Eleanor what she said to them. She said she had told the police that defendant had choked her. Defendant said that was a "damn lie" and told her she "needed to fix it" or they would send him to "jail forever."

The next day, June 18, 2021, defendant came to Eleanor's tent uninvited while she had company. He was wearing a mask. Eleanor dialed 911, but hung up when defendant told her to get off the phone. Defendant said he had a gun and not to make any sudden movements or he would shoot them. Eleanor feared for her life. Eleanor and a male guest started crying, but defendant told them to stop and threatened to punch the man if he did not shut up. Defendant told Eleanor that she needed to "fix" things with the police. He also told her that she needed to leave the area before he did something to her. When defendant left, Eleanor immediately packed up her stuff and went to the police.

C.      *Carli Doe: Counts Ten through Twelve*

Like the other victims, Carli was an unhoused woman living along the American River. She was a friend of defendant, who began seeing defendant romantically in July 2021, after her prior boyfriend passed away.

About a week into their two-week-long romantic relationship, defendant started to become paranoid and aggressive towards her. Then, on or about July 26, 2021, he became physically abusive. While in their (shared) tent, he threw a bottle of iced tea at

6

her face, knocking out part of her tooth and injuring her hand. Later that same evening, he threw something else at Carli, injuring her shoulder.

The night before, Carli had consensually orally copulated defendant for such a long period of time that her mouth became sore. She told defendant that she could not do that every night. Nevertheless, the following night defendant demanded she do it again. When she refused, defendant became angry and punched her, causing her nose to bleed. He then pushed her head down and forced her to orally copulate him. Defendant then got on top of her and started strangling her because she was not "doing it right." "Everything just went black" and Carli felt like she was going to die. At that point, Carli chose to cooperate because she did not want to die. She continued orally copulating defendant until he became less aggressive and then asked if they could just have intercourse to finish because her mouth hurt so bad. She did not consider the intercourse consensual because she was just doing it to survive.

Defendant was gone when Carli woke the next morning, but Carli did not flee because she was afraid defendant would return and catch her in the act. Instead, she sent a text message to her (then) friend, Kimberly—by that time, living in Denver—with a picture of the injuries to her face. She chose Kimberly because she had heard rumors that defendant had done "this same thing" to Kimberly—rumors Carli previously had not believed. Carli wrote that she would "take one for the team," by which she meant she would "be the one to get him put away" and "make sure it didn't happen to anybody else." She also wrote that she was going to try to get away and "get to [her] mom."

Before Carli could flee, defendant returned to camp. After seeing the injuries to her face, defendant became paranoid and forced Carli to remain in the tent.

That night, defendant forced Carli to orally copulate him again, despite her injuries. Carli testified that she didn't fight as hard as the night before, because she "didn't want it to go that way again." Nevertheless, defendant "strangled and choked [her] again" to force her to orally copulate him.

7

Law enforcement arrived the next morning and arrested defendant. Sergeant Randy Bickel described Carli as having an "absolute look of terror or fear on her face" and acting very " 'timid.' " Sergeant Bickel noticed injuries to Carli's face and neck. Carli told officers that defendant had abused and raped her and was holding her against her will.

The officers took Carli to the hospital for a sexual assault examination. Carli told the examiner that she was physically and sexually assaulted by her boyfriend. Carli had visible injuries to her face and neck, including bruising and swelling on her face, hand, shoulder, breasts, and thigh. She had bruising around her right eye, and the blood vessels in her eye had hemorrhaged, consistent with strangulation. The results of the examination overall were consistent with Carli's claims of assault.

Carli then went to live in Denver with Kimberly for about two months. When Carli and Kimberly had a falling out, Carli returned to living on the streets in Sacramento. At some point, Carli questioned why she should be the one to "help save the world." Around the same time, she heard from someone that defendant would pay her to recant her accusations against him. So she sent defendant an e-mail stating that she was thinking of ways to recant and researching whether she would be in trouble for making a false police report. Ultimately, she decided not to recant because she heard that other women had come forward against defendant.

D.    *Defense*

Defendant presented no evidence.

E.    *Verdict and Sentencing*

After a jury trial, defendant was found guilty as charged on all counts. The trial court sentenced defendant to an aggregate indeterminate term of 60 years to life, plus a consecutive determinate term of five years and eight months. Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of Evidence of Dating Relationship*

Defendant contends there was insufficient evidence of a "dating relationship" to support his convictions for domestic violence (§ 273.5, subd. (a)) against Eleanor and Carli. We conclude the evidence was sufficient.

In reviewing the sufficiency of the evidence to support a criminal conviction, we review the record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We do not reweigh the evidence or reevaluate the credibility of witnesses, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*Ibid.*) A judgment will be reversed only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 484.) Under this standard, the defendant bears an "enormous burden" in demonstrating the evidence was insufficient to support a conviction. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

Here, defendant was found guilty of two counts of domestic violence, in violation of section 273.5, subdivision (a). This offense required a predicate finding that defendant "has, or previously had, [a]. . . dating relationship" with the victims, Eleanor and Carli. (§ 273.5, subd. (b)(3).) The term "dating relationship" means "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." (§ 243, subd. (f)(10).)

Relying on *Oriola v. Thaler* (2000) 84 Cal.App.4th 397, 412 (*Oriola*), defendant argues that a "dating relationship" requires evidence of a long-standing or lasting relationship "that has endured for such a length of time and stimulated such frequent

interactions that the relationship cannot be deemed to have been casual."  Since defendant's relationships with Eleanor and Carli lasted less than a few weeks, he contends they were too short to qualify as dating relationships.  We find defendant's reliance on *Oriola* misplaced.

In *Oriola*, the court affirmed the denial of a restraining order under the Domestic Violence Prevention Act (the DVPA) (Fam. Code, § 6200 et seq.) because there was no evidence of a "dating relationship" between the parties.  (*Oriola, supra*, 84 Cal.App.4th at pp. 404-412, 415.)  At the time, the DVPA did not define a "dating relationship," so the court created a judicial definition.  (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1115.)  After reviewing classical and contemporary concepts of dating, as well as statutory definitions from other states, the court ultimately interpreted "dating relationship" to mean a "serious courtship," or a "social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." (*Oriola,* at p. 412.)

Less than a year after *Oriola*, the Legislature enacted Family Code section 6210, defining a "dating relationship" for purposes of the DVPA as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations."  (Fam. Code, § 6210; Stats. 2001, ch. 110, § 1.) This is the same definition that now governs a violation of section 273.5, subdivision (a). (§§ 243, subd. (f)(10), 273.5, subd. (b)(3).)  The legislative history of the amendment makes clear the Legislature disapproved of the *Oriola* court's definition "because it imposed too narrow a test for what constitutes a dating relationship."  (*M.A. v. B.F.* (2024) 99 Cal.App.5th 559, 569; *id*. at p. 579 (dis. opn. of Sanchez, J.); Assem. Com. on Judiciary, analysis of Assem. Bill No. 362 (2001-2002 Reg. Sess.) as introduced Feb. 16, 2001, pp. 4-6.)

The current definition of a "dating relationship" does not require a " 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time." (*People v. Rucker, supra*, 126 Cal.App.4th at p. 1116.) Rather, the statute requires only that there be " ' "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations, " ' " a definition intended to encompass a broad range of dating relationships, including those that are relatively new. (*Ibid*.) At the same time, the statutory definition "does not include 'a casual relationship or an ordinary fraternization between [two] individuals in a business or social context . . . .' " (*Id*. at p. 1117, fn. omitted; see *M.A. v. B.F.*, *supra*, 99 Cal.App.5th at p. 576 [affirming that a casual relationship marked by brief, sporadic " 'hook ups' " was not a "dating relationship," while cautioning that another trier of fact could find that being " 'friends with benefits' " was a dating relationship].)

The question of a dating relationship is "inherently fact intensive and case specific," (*M.A. v. B.F.*, *supra*, 99 Cal.App.5th at p. 572.) and can be based largely on inferences.[4] (*Id*. at p. 574.) "Given our society's evolving understanding of personal relationships, it is virtually impossible to craft a bright-line test to definitively identify a relationship that is—or is not—a dating relationship." (*Id*. at pp. 576-577.) "The trier of fact in each case must consider the evidence, the credibility of the evidence, and the reasonable inferences to be drawn from it." (*Ibid*.)

Under the facts of this case, we conclude there was substantial evidence to support finding "dating relationships" between defendant and Carli and Eleanor. With regard to Carli, there was evidence that (1) Carli and defendant were friends for several years

---

[4]     Contrary to what defendant argues, this is an objective inquiry; the prosecution was not required to prove that defendant subjectively believed he was in a dating relationship.

before they began dating romantically; (2) they began dating after Carli's previous boyfriend died; (3) Carli and defendant were involved in a romantic relationship for about two weeks, (4) during that time, they lived together in the same tent, (5) defendant's crimes against Carli took place in the tent that they shared, and (6) Carli told the sexual assault examiner that she was attacked by her "boyfriend." Indeed, defense counsel conceded that defendant and Carli were in a "sexual relationship" and that they were together for two weeks. With regard to Eleanor, the jury heard Eleanor's testimony that she and defendant were no longer just friends; they were seeing each other romantically and staying in each other's tents.

Defendant argues this evidence was not sufficiently specific to establish defendant and the victims had "frequent, intimate associations." However, our standard of review requires that we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. Only if the appellate record establishes that the evidence cannot, on any hypothesis, support the trier of fact's finding that a dating relationship existed may the judgment be reversed. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

Applying this standard, we conclude there was substantial evidence to support the jury's findings of a dating relationship between defendant and the two victims. We reach this conclusion notwithstanding that Eleanor did not know defendant's real name and referred to him as "this person" during her 911 emergency calls. We do not think it was necessary for the victims to describe in detail multiple instances of intimacy to establish that they were in a dating relationship. The victims' descriptions of their relationships as "romantic," combined with the evidence that they lived together or stayed in each other's tents, was sufficient for reasonable jurors to infer they had frequent, intimate associations

12

characterized by expectations of affectional or sexual involvement.[5] Accordingly, we find substantial evidence to support the convictions for domestic violence.

## II

### *Prior Domestic Violence Conviction*

Defendant claims the trial court erred by (1) admitting evidence of his prior domestic violence conviction under Evidence Code section 1109, and (2) instructing the jury with CALCRIM No. 852A, the standard jury instruction regarding evidence of uncharged domestic violence. We conclude that defendant has forfeited many of his contentions and that the others either lack merit or were harmless errors.

A.     *Additional Factual Background*

Before trial, the prosecution moved to admit a 2013 domestic violence conviction as propensity evidence under Evidence Code sections 1109 and 1101. The prosecution argued that the prior conviction was relevant and admissible because it involved the same type of offense (a violation of § 273.5, subd. (a)) and was not too remote (occurring less than 10 years before the charged offense). To lessen the risk of prejudice, juror confusion, and undue consumption of time, the prosecution proposed to prove the prior offense using only documentary evidence of the conviction, without testimonial proof of the underlying facts. Defendant objected on the grounds that the prior conviction was stale and the evidence was more prejudicial than probative, arguing that the testimony regarding the charged crimes "is going to be inflammatory, and it's going to be emotional. And to add onto that, the 2013 conviction, would just result in undue prejudice."

---

[5]     We acknowledge that many of the cases cited by defendant involve clearer evidence of a dating relationship, but comparison with these other cases is "of limited utility, since each case necessarily depends on its own facts. [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

After a hearing, the trial court granted the prosecution's motion, concluding that the prior conviction was not stale and was not rendered inadmissible by Evidence Code section 352. The court also asked defense counsel whether, if the court ruled in the prosecution's favor, defendant would prefer the evidence be admitted through a certified conviction or by way of judicial notice, and defense counsel indicated judicial notice.

At the conclusion of its case-in-chief, the prosecution asked the trial court to take judicial notice that defendant was "convicted of domestic violence under Penal Code Section 273.5[, subdivision] (a) on December 30th, 2014, in Solano County."[6] The court granted the request and instructed the jury that it must accept the judicially noticed fact as true. The court also instructed the jury with CALCRIM No. 852A, as follows:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: from 2013 in Solano County.

"*Domestic violence* means abuse committed against an adult who is a person who dated the defendant.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence. Proof by a preponderance of evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you may disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed

---

[6] Defendant pleaded guilty and was sentenced to formal probation on August 16, 2013. On December 30, 2014, he was found to have violated probation and was sentenced to three years in prison.

or inclined to commit domestic violence, and, based on that decision, also conclude that the defendant was likely to commit and did commit Counts [seven] and [eleven], willfully inflicting corporal injury resulting in a traumatic condition upon Eleanor Doe (Count [seven]) and Carli Doe (Count [eleven]) as charged here.  If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of willfully inflicting corporal injury resulting in a traumatic condition upon Eleanor Doe (Count [seven]) and Carli Doe (Count [eleven]).  The People must still prove each count beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

B.      *Admissibility of Prior Conviction*

Under Evidence Code section 1101, subdivision (a), evidence of prior criminal acts is generally inadmissible to prove a defendant's criminal disposition to commit such acts.  (*People v. Lindberg, supra,* 45 Cal.4th at p. 22.)  However, the Legislature has carved out an exception to this rule for cases involving domestic violence.  (Evid. Code, § 1109.)  As relevant here, Evidence Code section 1109, subdivision (a)(1), states that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."  Evidence Code section 1109 permits the admission of other acts of domestic violence to show a defendant's propensity or disposition to commit such crimes.  (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)  It is based upon a legislative policy determination that the use of propensity evidence is appropriate in domestic violence cases because of the typically repetitive nature and difficulties of proof of domestic violence crimes.  (*Ibid.*; *People v. Johnson* (2010) 185 Cal.App.4th 520, 532 (*Johnson*); *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.)

We review a trial court's decision to admit evidence under Evidence Code section 1109 for abuse of discretion. (*People v. Mani* (2022) 74 Cal.App.5th 343, 358.)

Defendant contends it was in error to admit his prior domestic violence conviction for three reasons. First, he argues it was improper for the trial court to admit the prior conviction as propensity evidence under Evidence Code section 1109 because there was insufficient evidence to support a finding of "domestic violence." Next, he argues that the statute only applies if there is evidence the defendant *personally* committed the prior act of domestic violence. Because the prosecution offered nothing more than the bare fact of his prior conviction, defendant contends the evidence was not sufficient to show that he *personally* committed the offense, as his conviction could have been based on aiding and abetting. Finally, he argues the trial court erred in taking judicial notice of the prior domestic violence conviction without receiving sufficient details about the prior offense to perform an adequate Evidence Code section 352 analysis.

The People counter that defendant forfeited each of these contentions by failing to raise timely and specific objections below. We agree.

"Evidence Code section 353, subdivision (a), provides that a court may not reverse a judgment based on error in admitting evidence unless 'an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion.' 'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citations.]' [Citation.] 'Although no "particular form of objection" is required, the objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." [Citation.]' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 130.) "The purpose of this rule 'is to encourage a defendant to bring any errors to the trial court's attention so

16

the court may correct or avoid the errors and provide the defendant with a fair trial.' [Citation.]" (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.)

Here, in opposing the prosecution's motion in limine, defense counsel never argued that his prior conviction was inadmissible under Evidence Code section 1109 because (1) there was insufficient evidence to support a finding of "domestic violence" in this case, (2) there was insufficient proof that he personally or directly committed the prior act of domestic violence, or because (3) a prior section 273.5 conviction cannot be admitted under Evidence Code section 1109 based on documentary evidence alone. Defense counsel objected only that the prior conviction should be excluded because it was too remote and because it was unduly prejudicial under Evidence Code section 352. We agree with the People that these objections were insufficient to preserve the issues that defendant now seeks to raise on appeal. (*People v. Valdez, supra*, 55 Cal.4th at p. 130; *People v. Barnett* (1998) 17 Cal.4th 1044, 1130.)

To the extent defendant also claims the trial court abused its discretion by failing to conduct a meaningful Evidence Code section 352 analysis, we reject that claim on the merits. The record shows that before admitting the evidence, the trial court concluded on balance that the probative value of defendant's prior conviction was not "substantially outweighed" by the probability that its admission would consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. Defendant has failed to show this was an abuse of discretion.[7] (See *People v. Brown, supra*, 192 Cal.App.4th at p. 1233.)

---

[7]  The prior offense, a violation of section 273.5, subdivision (a), was the same type of offense charged in the instant case, and therefore probative. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969-970 (*Wesson*).) The prior conviction involved a different victim and was not too remote. (*Johnson, supra*, 185 Cal.App.4th at pp. 534-535, 537; Evid. Code, § 1109, subd. (e).) There were no issues regarding the commission of the prior offense because defendant was convicted of the crime by guilty plea. (*Wesson, supra*, at pp. 967-968, 970.) The jury was not likely to be confused, misled, or distracted

C. *Jury Instructions*

Defendant further contends that the trial court erred by instructing the jury with a slightly modified version of CALCRIM No. 852A, the standard jury instruction regarding evidence of uncharged domestic violence. Specifically, he contends the court erroneously (1) told the jury in the preface to the instruction that there was evidence that defendant "committed" domestic violence not charged in this case; (2) allowed the jury to draw an adverse propensity inference that was unsupported by the evidence; and (3) narrowed the definition of "domestic violence" to mean "abuse committed against an adult who is a person who dated the defendant." Again, the People argue that defendant forfeited these arguments because he did not object or request a modification to the instruction in the trial court.

We agree that defendant forfeited his challenge to the prefatory language in the instruction. The general rule is that a trial judge has a sua sponte duty to instruct the jury on all "general principles of law relevant to the issues raised by the evidence; that is, those principles that are closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) However, " 'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

Defendant does not dispute that he failed to object but contends the forfeiture rule does not apply because the trial court gave an incorrect statement of the law. He

---

by the prior offense because it was admitted via judicial notice. Further, the admission of documentary evidence alone "removed much of the potential inflammatory details" of the prior offense. (*Id*. at p. 970.) Given the probative value of the evidence, and the low probability of undue prejudice in the sense contemplated by Evidence Code section 352 (*People v. Zapien* (1993) 4 Cal.4th 929, 958), we cannot say the trial court abused its discretion by admitting the evidence under Evidence Code section 1109.

18

contends the prefatory language in the instruction misstated the law by telling the jury that the judicially noticed conviction was "*evidence* that the defendant *committed* domestic violence" that was not charged in the case.

We do not find the challenged language to be an incorrect statement of law. Contrary to what defendant argues, documentary evidence of a prior conviction is admissible to prove that a defendant "committed" the underlying offense. (*Wesson, supra*, 138 Cal.App.4th at pp. 967-968; see *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461; Evid. Code, § 452.5, subd. (b).)

Further, we reject defendant's suggestion that Evidence Code section 1109 only applies if there is proof the defendant *personally* committed the prior domestic violence offense. The statutory language is not so limited. Subject to the constraints of Evidence Code section 352, the statute broadly permits "evidence of the defendant's commission of other domestic violence" to prove his or her propensity to commit other offenses involving domestic violence. (*Johnson, supra*, 185 Cal.App.4th at p. 528.) It is settled that those who aid and abet a crime and those who directly perpetrate a crime are both "principals" in its commission. (§ 31; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190 [aiding and abetting is a means by which derivative liability for the commission of the offense is imposed, not a separate criminal offense]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [" When a person 'chooses to become a part of the criminal activity of another, she says in essence, "your acts are my acts . . . ." ' "].) Therefore, it does not matter whether defendant "committed" the prior offense as a direct perpetrator or as an aider and abettor. Because the prefatory language was a generally accurate statement of the law, defendant's failure to object to it forfeits the issue on appeal.

We turn now to defendant's claim that the trial court erred by allowing the jury to draw an adverse propensity inference unsupported by evidence that he "committed" the prior act of domestic violence. We need not decide whether defendant forfeited this contention because we can easily reject it on the merits. As discussed, defendant's prior

conviction was sufficient to prove that he "committed" the prior domestic violence. (*Wesson, supra*, 138 Cal.App.4th at pp. 967-968.) Thus, the court properly permitted the jury to draw the propensity inference. (*Johnson, supra*, 185 Cal.App.4th at p. 529; see *People v. Villatoro* (2012) 54 Cal.4th 1152, 1166-1167 (*Villatoro*).)

Defendant's final contention is that the trial court's modifications to the instruction improperly narrowed the definition of "domestic violence." Although defendant may have technically forfeited this issue, we nevertheless exercise our discretion to address the merits because the instruction arguably affected his substantial rights. (§ 1259; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

We review claims of instructional error de novo. (*People v. Stinson* (2019) 31 Cal.App.5th 464, 476.) Based on our independent review of the record, we agree that the instruction erroneously defined "domestic violence," but we find the error harmless.

For purposes of Evidence Code section 1109, "domestic violence" is defined as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (§ 13700, subd. (b).) As given, however, the trial court's instruction narrowed this definition to "abuse committed against an adult who is a person who dated the defendant." Defendant contends this was in error because there was no evidence adduced at trial as to the nature of the relationship between defendant and the victim of his prior domestic violence offense. Defendant is correct. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [error to give an instruction that has no application to the facts].) Indeed, the 2013 felony complaint did not even allege a dating relationship; it alleged the victim was a "cohabitant." Thus, there was no basis for the trial court to modify the instruction (CALCRIM No. 852A) to exclude the other categories of victims set forth in section 13700.

Nevertheless, the error was harmless under any standard. (See *Chapman v. Cal.* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711]; *People v. Watson* (1956) 46 Cal.2d 818,

20

837.)  First, rather than prejudice defendant, the trial court's overly restrictive definition of "domestic violence" arguably benefitted him by making it *less likely* the jury would find the People "proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence."

Second, even if the error led the jury to mistakenly conclude that defendant's prior offense involved a person who was dating the defendant—when, in fact, the person was a different kind of victim (e.g., a cohabitant)—the instruction did not, as defendant contends, permit the jury to draw a propensity inference for the current offenses without finding that defendant had an actual " 'dating relationship' " with the current complaining witnesses.  Based on CALCRIM No. 840, the trial court expressly instructed the jury that to prove defendant guilty of domestic violence (counts seven and eleven) the People must prove that defendant "willfully inflicted a physical injury *on someone with whom he had a dating relationship*."  (Italics added.)  The trial court also instructed the jury on the meaning of a " 'dating relationship,' " and the prosecution addressed this element in closing arguments.  We presume the jury understood and followed the instructions they were given.  (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026.)

We also are not persuaded that the erroneous instruction artificially gave the propensity inference "much greater weight."  Whether the prior domestic violence involved a dating relationship, or some other category of relationship to which the domestic violence statute applies, the trial court properly admitted the evidence showing that defendant committed the prior domestic violence offense.  (*Wesson, supra*, 138 Cal.App.4th at pp. 967-968.)  And the court properly instructed the jury that if it found by a preponderance of the evidence that defendant committed the prior domestic violence offense, it may, but was not required to, infer that he had a disposition to commit other offenses involving domestic violence, and further infer that he was likely to commit and did commit the crimes of which he is accused.  In arguments to the jury, the prosecution noted the prior conviction and the permissive inference flowing from it, but

21

the prosecution did not rely heavily on this evidence and said nothing about the nature of the relationship between defendant and the prior victim. On this record, we have no doubt that the court's overly restrictive definition of "domestic violence" did not contribute to the jury's verdict. In short, the error was unimportant in relation to all the other materials considered by the jury.

III

*CALCRIM No. 1191B*

Defendant claims the trial court erred in giving CALCRIM No. 1191B, governing the use of a charged sexual offense for propensity purposes, without first conducting an Evidence Code section 352 analysis. We find no prejudicial error.

A.    *Legal Background*

Like Evidence Code section 1109, Evidence Code section 1108 creates an exception to the rule against admitting character evidence to prove conduct on a specific occasion. It provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) By its terms, the statute does not distinguish between charged or uncharged sexual offenses, and our California Supreme Court has held that the statute permits a jury to draw a propensity inference from a currently charged sex offense. (*Villatoro, supra*, 54 Cal.4th at pp. 1156, 1160-1162.)

Here, consistent with the standard instruction (CALCRIM No. 1191B), the trial court instructed the jury that: "The People presented evidence that the defendant committed the crimes of rape by force, charged in Count One, and oral copulation by force, charged in Counts Two, Three, and Ten. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the

22

defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge beyond a reasonable doubt."

B. *Analysis*

Defendant argues that a trial court must undertake an Evidence Code section 352 analysis before giving a propensity instruction under Evidence Code section 1108. He further contends that in the absence of an "affirmative showing" that the court complied with this duty, we must presume it did not occur. Because the record here is silent on whether the court conducted an Evidence Code section 352 analysis with respect to the evidence of the charged sexual offenses, defendant contends the trial court erred by giving the CALCRIM No. 1191B instruction.

We conclude that defendant forfeited this contention by failing to object to the *admissibility* of such evidence for propensity purposes. (*People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293, 1305; *People v. Valdez, supra*, 55 Cal.4th at p. 138; see *People v. Gunder* (2007) 151 Cal.App.4th 412, 417 [defendant's failure to object forfeited claim that the prosecutor improperly used evidence to show propensity]; see also *People v. Griggs* (2003) 110 Cal.App.4th 1137, 1139-1140 [no sua sponte duty to instruct on limited admissibility of evidence of past criminal conduct].)

In any event, we do not find any error in failing to conduct an Evidence Code section 352 analysis before admitting the evidence for propensity purposes and giving CALCRIM No. 1191B was harmless. (*Villatoro, supra*, 54 Cal.4th at pp. 1168-1169.) The evidence of the charged sexual offenses was highly probative of defendant's propensity to commit such crimes and was not unduly prejudicial. Given the timing and similarity of the attacks—forcible sexual assaults against unhoused women with whom he had a dating or close social relationship—we have little doubt that the trial court

23

would have concluded the evidence was properly admissible, not only to prove the charged offenses, but also as propensity evidence. (*Ibid.*; see *People v. Karis* (1988) 46 Cal.3d 612, 638.) Thus, we conclude the trial court did not commit a reversible error in instructing the jury under CALCRIM No. 1191B that it may draw a propensity inference from the admitted evidence.

IV

*Constitutionality of CALCRIM Nos. 852A and 1191B*

Defendant also claims that giving the jury CALCRIM Nos. 852A and 1191B violated his constitutional right to due process by permitting it to draw an inference of guilt based on propensity evidence. Specifically, defendant contends that (1) CALCRIM No. 852A contained an unconstitutional permissive inference that permitted the jury to infer from his prior conviction for domestic violence that he was prone to commit domestic violence and therefore likely to commit, and did commit, the charged domestic violence offenses; (2) CALCRIM No. 1191B contained an unconstitutional permissive inference that permitted the jury to infer from the commission of one charged sex offense that he was prone to commit other sexual offenses and therefore likely to commit, and did commit, the charged sexual offenses; and (3) that the combined effect of these instructions allowed the jury to stack inference upon inference, and thereby use defendant's prior domestic violence conviction to prove the charged sexual offenses.

As a preliminary matter, we note that defendant did not object to either instruction on due process grounds at trial, such that this claim of error was forfeited. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Partida* (2005) 37 Cal.4th 428, 437-438.) Nevertheless, we address the merits because the error arguably affected his substantial rights. (§ 1259.)

On the merits, we reject defendant's claims that his due process rights were violated. The "controlling" test for assessing the validity of an evidentiary presumption (inference) asks whether there is a "rational connection" between the facts proved and the

24

ultimate fact presumed. (*Tot v. United States* (1943) 319 U.S. 463, 467-468 [87 L.Ed. 1519, 1525]; *County Court of Ulster County, New York, et al. v. Allen* (1979) 442 U.S. 140, 142, 165 [60 L.Ed.2d 777, 783, 797] (*Ulster County*).) A permissive inference—one that leaves the jury free to accept or reject it—satisfies the rational connection test if it can be said " 'with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.' [Citation.]" (*Ulster County, supra*, 442 U.S. at pp. 165, 166, fn. 28 [60 L.Ed.2d at p. 797].) Conversely, a permissive inference violates due process "if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [85 L.Ed.2d 344, 353-354]; *People v. Mendoza* (2000) 24 Cal.4th 130, 180, superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn.8.)

The determination of whether a permissive inference violates the "rational connection" test is assessed on a case-by-case basis. (*Ulster County, supra*, 442 U.S. at pp. 157, 162-163 [60 L.Ed.2d at pp. 792, 796].) The party challenging the permissive inference must demonstrate its unconstitutionality "as applied" to the facts of the case. (*Id.* at pp. 157, [60 L.Ed.2d at p. 792].)

Here, we conclude that the permissive inferences authorized by CALCRIM Nos. 852A and 1191B were rational under the facts of this case.[8] It is rational to infer that defendant, having previously been convicted of domestic violence, has a disposition toward committing such offenses and that such disposition increases the likelihood that defendant committed the charged domestic violence offenses. (*Wesson, supra*, 138 Cal.App.4th at pp. 967-969; *People v. Mani, supra*, 74 Cal.App.5th at pp. 377-378.)

---

[8] In reaching this conclusion, we note that California courts have rejected facial due process challenges to Evidence Code sections 1108 and 1109 and the jury instructions derived from them. (See *Villatoro, supra*, 54 Cal.4th at p. 1160; *People v. Robertson* (2012) 208 Cal.App.4th 965, 994.)

Likewise, if the People proved that defendant committed one or more of the charged sexual offenses, it is rational to infer that defendant was prone to commit sexual offenses of a similar nature, and to additionally infer that such predisposition increases the likelihood defendant committed the other charged sexual offenses. (*Villatoro, supra*, 54 Cal.4th at p. 1156; *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68.) Although the sexual offenses involved two different crimes (rape by force and oral copulation by force), the offenses were strikingly similar in that the victims were both unhoused women who had befriended or dated defendant, and who were sexually assaulted by defendant in a tent.

We reject defendant's argument that the combined effect of the instructions was to allow the jury to find him guilty of the charged sexual offenses based upon his prior domestic violence conviction. CALCRIM No. 852A specifically instructed the jury that they could use defendant's prior domestic violence conviction to determine whether he committed the charged domestic violence counts (counts seven and eleven) and for no other purpose. The jury also was instructed that the propensity evidence was "only one factor to consider," and that it was "not sufficient by itself to prove that the defendant is guilty of [counts seven and eleven]," which had to be proven beyond a reasonable doubt. The trial court gave similar instructions in connection with the sexual offenses using CALCRIM No. 1191B. The jury is presumed to have followed the court's instructions. (*People v. Frederickson, supra*, 8 Cal.5th at p. 1026.) Thus, the instructions did not impermissibly allow the jury to find defendant guilty of the charged sexual offenses based on the prior domestic violence conviction.

V

Mayberry *Instruction*

Defendant argues that the trial court erred in failing to give, sua sponte, an instruction under *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*) on the defense of

26

reasonable and good faith belief in the victim's consent in connection with the forcible oral copulation counts (counts two, three, and ten). We find no error.

A. *Legal Background*

In *Mayberry, supra*, 15 Cal.3d 143, our Supreme Court held that a defendant's "reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. [Citation.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360 (*Williams*).) *Mayberry* is predicated on the notion that a reasonable mistake of fact regarding the victim's consent is "incompatible with the existence of wrongful intent" on the part of the defendant. (*Ibid*.) Thus, the *Mayberry* defense has been found to apply, not only to rape, but to other sexual crimes in which the victim's lack of consent is an essential element of the offense. (*People v. Andrews* (2015) 234 Cal.App.4th 590, 602.)

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual [conduct]. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent." (*Williams, supra*, 4 Cal.4th at pp. 360-361, fn. omitted.) The objective component asks whether the defendant's subjective good faith mistake was objectively reasonable under the circumstances. (*Id*. at p. 361.)

B. *Analysis*

A trial court has a sua sponte duty to instruct on a *Mayberry* defense " ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424; *People v. Molano* (2019) 7 Cal.5th 620, 667.) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury

27

could find persuasive.' [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

Here, there was no substantial evidence to support a *Mayberry* instruction for the oral copulation counts. The victims' testimony, if believed, precluded any *reasonable* belief of consent since they testified that defendant used physical violence and threats of violence to force them to orally copulate him. (*People v. Duarte-Lara* (2020) 49 Cal.App.5th 332, 341.) And defendant did not offer any evidence that he honestly and reasonably, but mistakenly, believed that the victims consented. Instead, he sought to create reasonable doubt by challenging the victims' motives and credibility. If the jury agreed with defendant, it could have found him not guilty by concluding that the alleged sexual conduct did not occur, or was consensual, or was not accomplished by force, violence, duress, menace, or fear. But this does not change the fact that there was no substantial evidence of "equivocal conduct [by the victims] that could be reasonably and in good faith relied on to form a mistaken belief of consent." (*Williams, supra*, 4 Cal.4th at p. 364.)

Because the defense neither relied on a mistake-of-fact defense, nor presented any substantial evidence supportive of such a defense, the trial court had no sua sponte duty to give a *Mayberry* instruction for the oral copulation counts. (*People v. Maury, supra*, 30 Cal.4th at pp. 424-425; *Williams, supra*, 4 Cal.4th at pp. 361-363; *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1300-1303; see also *People v. Lawson* (2013) 215 Cal.App.4th 108, 117-119 [no sua sponte duty to instruct on defense that serves only to negate the mental state element of a charged crime].)

VI

*Instruction on Lesser Included Offenses*

Defendant additionally contends the trial court erred in failing to sua sponte instruct the jury on lesser included offenses in connection with the charges of domestic violence, aggravated assault, false imprisonment, and criminal threats. We conclude that

28

the trial court erred by not instructing the jury on a lesser included offense for count five, and reverse count five on that basis.  We conclude that the other claims of error either lack merit or were harmless error.

A.    *Legal Background*

The trial court's duty to instruct on the general principles of law applicable to the case includes a sua sponte duty to instruct the jury on all lesser included offenses supported by substantial evidence.  (*People v. Shockley* (2013) 58 Cal.4th 400, 403.)  Substantial evidence in this context means evidence from which a reasonable jury could conclude that the defendant is guilty of the lesser, but not the greater, offense.  (*Ibid.*)  "Although instruction on a lesser included offense 'is not required when the evidence supporting such an instruction is weak' [citation] or based on speculation [citation], it is required when the lesser included offense is supported by ' "evidence that a reasonable jury could find persuasive [citation]." ' "  (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)

The duty to instruct on lesser included offenses, unlike the duty to instruct on a defense, exists even when the instruction is inconsistent with the defendant's trial tactics or contrary to the defendant's wishes.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*), disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7, abrogated on another ground by amendment of section 189.)  The rule's purpose is to "protect[] the jury's ' "truth-ascertainment function[,]" ' by " 'ensur[ing] that the verdict is no harsher or more lenient than the evidence merits.  [Citations.]' " "  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.)

On appeal, we independently review a trial court's failure to instruct on a lesser included offense.  (*People v. Cook* (2006) 39 Cal.4th 566, 596.)  In deciding whether there is substantial evidence to support an instruction, we construe the evidence in the light most favorable to the defendant.  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)  However, we must "assess sufficiency of the evidence without evaluating the

credibility of witnesses, for that is a task reserved for the jury. [Citation.]" (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

        B.       *The Domestic Violence Counts (Counts Seven and Eleven)*

Defendant was charged in counts seven (Eleanor) and eleven (Carli) with causing corporal injury to a person with whom he had a dating relationship (§ 273.5, subd. (a)). Defendant claims the trial court erred by failing to instruct on simple assault (§ 240) and battery (§ 242) as lesser included offenses to counts seven and eleven because there was insufficient evidence to establish defendant had a "dating relationship" with Carli or Eleanor. Defendant alternatively claims the trial court erred by failing to instruct on misdemeanor domestic battery (§ 243, subd. (e)(1)) as a lesser included offense to count seven because (1) there were reasons to doubt Eleanor's testimony that she was choked and suffered a traumatic condition as a result, and (2) defendant could have been convicted of the lesser offense for kicking dirt and rocks at Eleanor.

We reject defendant's claim that a lesser included instruction was required for counts seven and eleven because there was insufficient evidence of a "dating relationship." As discussed in part I of our opinion, *ante*, we do not agree that the testimony of Carli and Eleanor was too "vague" and "conclusory" to establish they had "frequent, intimate associations" with defendant. We concluded that the victims' descriptions of their relationships as "romantic," combined with the evidence that they lived together or stayed in each other's tents, was sufficient for the jury to conclude they were in dating relationships with defendant.

Further, defendant presented no evidence to suggest that Carli or Eleanor were "just" his friends. His defense at trial was that they were lying about the abuse, not that they were lying about being in a romantic relationship. Here, based on the evidence presented, the jury either could believe the victims and find defendant guilty of the greater offense, or disbelieve them and find him not guilty. (*People v. Friend* (2009) 47 Cal.4th 1, 51-52; see *People v. Abilez* (2007) 41 Cal.4th 472, 515 [all-or-nothing

choice did not violate his rights because, on the state of the evidence presented, the crime was either robbery or nothing].)  But there was no substantial evidence to support instructing the jury on a lesser included offense.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1063 ["[I]f there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such [lesser included] instructions shall not be given"]; accord, *People v. Acevedo* (1985) 166 Cal.App.3d 196, 201.)

We find it unnecessary to decide whether the trial court properly declined to instruct on the lesser included offense of misdemeanor domestic battery (§ 243, subd. (e)(1)) because we conclude any error was necessarily harmless.  An erroneous failure to instruct on a lesser included offense is subject to harmless error analysis under *People v. Watson, supra*, 46 Cal.2d at page 837.  (*Breverman, supra*, 19 Cal.4th at p. 165.)  The failure to instruct is a reversible error only if it is reasonably probable that the defendant would have obtained a more favorable result had the error not occurred.  (*Id*. at p. 178.) "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result."  (*Id*. at p. 177; accord, *People v. Moye* (2009) 47 Cal.4th 537, 556.)

Here, even if there was "some" evidence to question whether defendant choked Eleanor, there is no reasonable probability the claimed instructional error affected the result.  To begin, the evidence supporting the jury's finding that Eleanor was choked and

suffered at least a minor injury was strong.[9] It included Eleanor's testimony, her statement to the police, the 911 call, and the photographs of the injuries to her neck and eyes. Conversely, the evidence that she was not choked—consisting of defendant's self-interested denial—was comparatively weak. Further, the prosecution's theory at trial was based on defendant choking/strangling Eleanor, not defendant's act of kicking dirt and rocks at her. Accordingly, if there was any error in the instruction, it was harmless. It is not reasonably probable that the jury would have acquitted defendant of the greater offense and returned a conviction for a lesser offense of domestic battery based on defendant's act of kicking dirt and rocks. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1161, overruled on other grounds as stated in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

      C.    *The Aggravated Assault Counts (Counts Five, Six, & Eight)*

Defendant was charged in counts five (Kimberly), six (Kimberly), and eight (Eleanor) with aggravated assault (§ 245, subd. (a)(4)). Defendant claims the trial court erred by failing to instruct, sua sponte, on simple assault (§ 240) as a lesser included offense to each of these counts. We agree that the trial court erred in failing to give lesser included instructions for counts five and eight, but not count six. In addition, we conclude the failure to give a lesser included instruction for count eight was harmless.

A person who assaults another by means likely to produce great bodily injury can be convicted of aggravated assault. (§ 245, subd. (a)(4).) The prosecution does not have to prove that great bodily injury was inflicted, only that defendant exerted sufficient force to inflict such an injury. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.) A person can be guilty of an aggravated assault despite causing no injury so long as his

---

[9]    A traumatic condition is "a wound or other bodily injury, whether minor or serious, caused by the direct application of physical force." (CALCRIM No. 840; *People v. Abrego* (1993) 21 Cal.App.4th 133, 137.)

actions made a serious injury likely. (*People v. Drayton* (2019) 42 Cal.App.5th 612, 617.) " 'Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate.' " (*Ibid.*; see *People v. Washington* (2012) 210 Cal.App.4th 1042, 1047 [some physical pain or damage, such as abrasions, lacerations, and bruising is sufficient to show great bodily injury].) While injury is not an element of the crime, the nature and extent of any injury inflicted is highly probative of whether the force applied was likely to cause significant injury. (*People v. McDaniel, supra*, 159 Cal.App.4th at p. 748.) Simple assault is a lesser included offense of aggravated assault. (*Id.* at p. 747.)

Defendant contends that the trial court should have instructed the jury on simple assault as a lesser included offense to count five, the initial "strangulation" (or "choking") of Kimberly, because the jury could have found that Kimberly was placed in a simple headlock that was not likely to produce great bodily injury. We agree.

Although Kimberly testified that defendant put his arm around her neck and squeezed so tight that she could not breathe, her testimony on this point was vague and somewhat inconsistent. Further, when she was examined at the hospital, she disclaimed having been "strangled" or "suffocated," and the examiner did not observe any injuries to her head, face, or neck. In short, there was substantial evidence to support reasonable doubt the force used was sufficient to produce great bodily injury. (*People v. Duke* (1985) 174 Cal.App.3d 296, 302-303 [headlock that made the victim feel "choked," but that did not cut off breathing, was insufficient to support aggravated assault].) We conclude that it is reasonably probable that the defendant would have obtained a more favorable result had this error not occurred. We also conclude, however, that the evidence does not compel a finding that defendant is guilty of only the lesser offense. Accordingly, we reverse the conviction for count five and remand to permit the People the option of retrying the greater offense, or accepting a modification of the judgment to

33

reflect a conviction of the lesser offense. (*People v. Hayes* (2006) 142 Cal.App.4th 175, 184; *People v. Perez-Robles* (2023) 95 Cal.App.5th 222, 238-239.)

We do not agree the trial court erred by failing to instruct on simple assault as a lesser included offense to count six, which was based on the beating that Kimberly received on March 4, 2020. Defendant contends there was reason to doubt Kimberly's veracity and the jury could have found that defendant fought Kimberly without giving her the "beating" she described. But there was no evidence adduced by the defense to cast doubt upon Kimberly's description of the severity of her injuries. As we noted above, the mere unexplainable disbelief of part of the prosecution's case is not substantial evidence to warrant an instruction on a lesser included offense. (*People v. Kraft, supra*, 23 Cal.4th at p. 1063.)

As to count eight, the choking of Eleanor, we agree the trial court erred by failing to instruct the jury on simple assault as a lesser included offense since there was evidence that reasonably *could have* raised questions in a juror's mind as to whether defendant choked Eleanor with force likely to produce great bodily injury.[10] But we find the error harmless. Eleanor's testimony, statements to law enforcement, and the recorded 911 calls provided evidence that she was choked with such force that she "couldn't breathe" and started to feel "dizzy and weak." And, although her injuries may have been difficult to see in photographs, the photographs corroborated her claim that she was choked with enough force to cause physical injuries, including bruising around the neck and eyes. In contrast, her statements and conduct during the 911 call constitute relatively weak evidence by which to question whether defendant exerted sufficient force to inflict great

---

[10]    Such evidence included that:  Eleanor's injuries were difficult to see in photographs; Eleanor said nothing about being choked the first two times she called 911 and instead complained that she had fallen and could not get up; Eleanor at times seemed to be taunting defendant during the third 911 call; and Eleanor equivocated when asked whether she needed emergency assistance.

34

bodily injury.  The jury heard all the evidence and found defendant assaulted Eleanor by means likely to produce great bodily injury.  We cannot say it is reasonably probable defendant would have obtained a more favorable outcome had the court instructed the jury on simple assault as a lesser included offense.

      D.      *The Felony False Imprisonment Counts (Counts Four and Twelve)*

Defendant was charged in counts four (Kimberly) and twelve (Carli) with felony false imprisonment (§ 236).  Defendant claims the trial court should have instructed on misdemeanor false imprisonment as a lesser included offense to those counts because there was substantial evidence to conclude that the imprisonment was effected without "violence" or "menace."

False imprisonment is "the unlawful violation of the personal liberty of another." (§ 236.)  "The misdemeanor offense requires no force beyond that necessary to restrain the victim." (*People v. Babich* (1993) 14 Cal.App.4th 801, 806.)  Misdemeanor false imprisonment becomes a felony if the imprisonment is effected with the use of violence, menace, fraud, or deceit.  (§ 237, subd. (a); *People v. Haney* (1977) 75 Cal.App.3d 308, 313.)  Violence means "using physical force that is greater than the force reasonably necessary to restrain someone." (CALCRIM No. 1240; *People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.)  Menace means "a verbal or physical threat of harm," which may be express or implied.  (CALCRIM No. 1240.)

We disagree that the trial court should have instructed on misdemeanor false imprisonment as a lesser included offense to count four.  The evidence shows that the false imprisonment followed immediately after the sexual assault of Kimberly, during which defendant forced her to orally copulate him.  Kimberly testified that she was scared and wanted to leave, but defendant blocked the door and told her she could not leave.  Defendant reportedly told her, " 'You remember what I said.  You are not leaving. You better keep your mouth shut.  Don't talk too much.' "  In addition, Kimberly reported that defendant made nonverbal threats, including "physical gestures of threat, menacing

35

look," and that defendant showed her a gun. This evidence was sufficient to support the conviction for felony false imprisonment. (*People v. Ghipriel* (2016) 1 Cal.App.5th 828, 833-835; *People v. Castro* (2006) 138 Cal.App.4th 137, 142-143.) In contrast, defendant presented no evidence that the offense was less than that charged.

We reach the same conclusion as to count twelve. Although there was no evidence that defendant made any *additional* verbal or physical threats to prevent Carli from leaving, to the extent her liberty was restrained at all, it was because of defendant's earlier abuse and the implied threat of additional harm. (See *People v. Islas* (2012) 210 Cal.App.4th 116, 127 [defendants created a climate of fear and coerced victims into cooperating through an implied threat of harm].) Again, defendant presented no evidence that the offense was less than that charged. Thus, there was no substantial evidence from which a rational jury could conclude that defendant committed misdemeanor false imprisonment but not felony false imprisonment.

E.      *The Criminal Threats Count (Count Nine)*

Defendant was charged with criminal threats (§ 422) in count nine (Eleanor). Defendant contends the trial court should have instructed on attempted criminal threats (*People v. Toledo* (2001) 26 Cal.4th 221, 224.) as a lesser included offense to count nine because there was substantial evidence—consisting of Eleanor's demeanor during the 911 calls—that Eleanor was not actually placed in sustained fear for her safety. But the events forming the basis for count nine took place on June 18, 2021, the day *after* the 911 calls, when defendant came to Eleanor's tent wearing a mask and threatened to shoot her and her friend if she did not "fix" things with the police. Nothing about that event casts doubt on Eleanor's testimony that she feared for her life. Accordingly, we conclude that the trial court had no sua sponte duty to instruct on attempted criminal threats as a lesser included offense to count nine.

## VII

### *Sentencing Error*

Based on our review of the record, we have identified two sentencing errors that require correction.  In the oral pronouncement of judgment, the trial court imposed, but stayed under section 654, a sentence of one-third the midterm for counts seven and twelve.  The one-third-the-mid-term rule only applies to a consecutive sentence, not a sentence that is stayed under section 654.  (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.)  Accordingly, we will modify the judgment to impose the low term for each stayed count (two years for count seven, and 16 months for count twelve).

## DISPOSITION

The conviction on count five (aggravated assault) is reversed and the matter is remanded with directions to give the prosecutor the option of retrying that offense, or accepting a reduction to the lesser included offense of assault (§ 240). If the People do not retry defendant on that offense within 60 days after the filing of the remittitur in the trial court pursuant to section 1382, subdivision (a)(2), the trial court shall proceed as though the remittitur constituted a modification of the judgment to reflect a conviction of only the lesser included offense of assault under section 240 and shall resentence defendant accordingly. (*People v. Hayes, supra*, 142 Cal.App.4th at p. 184.) The judgment is otherwise affirmed.

\s\\                                     ,
Krause, Acting P. J.

We concur:

\s\\                              ,
Boulware Eurie, J.

\s\\                              ,
Ashworth, J.[*]

---

[*]     Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.